# In the United States Court of Federal Claims

No. 19-748C

(E-filed: October 16, 2019)[1]

|  |  |  |
|---|---|---|
| METROPOLITAN INTERPRETERS AND TRANSLATORS, INC., | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | Motion to Strike; Supplementing the Administrative Record; Fed. R. Evid. 1006; Compliance with Formatting Requirements; Technical Evaluation; Past Performance Evaluation; FAR 8.404(d) (2018); FAR 8.405-2(d) (2018); Denying Permanent Injunctive Relief. |
| THE UNITED STATES, | ) ) ) | |
| Defendant, | ) ) ) | |
| and | ) ) | |
| MVM, INC., | ) ) ) | |
| Intervenor-defendant. | ) ) | |

Holly A. Roth, McLean, VA, for plaintiff.

Veronica N. Onyema, Trial Attorney, with whom appeared Joseph H. Hunt, Assistant Attorney General, Robert E. Kirschman, Jr., Director, and Douglas K. Mickle, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant. Douglas J. Becker, United States Immigration and Customs Enforcement, of counsel.

Meghan F. Leemon, Washington, DC, for intervenor-defendant.

---

[1]     This opinion was issued under seal on September 26, 2019.  Pursuant to ¶ 6 of the ordering language, the parties were invited to identify proprietary or confidential material subject to deletion on the basis that the material was protected/privileged.  The parties' agreed-upon redactions are acceptable to the court.  All redactions are indicated by brackets ([ ]).

<u>OPINION</u>

CAMPBELL-SMITH, Judge.

Plaintiff Metropolitan Interpreters and Translators, Inc. (also referred to as Metro or MIT), filed this bid protest to challenge the award of a contract for the provision of translation services to the United States Immigration and Customs Enforcement agency (the agency or ICE).  The parties' cross-motions for judgment on the administrative record (AR) and defendant's motion to strike are now before the court.  The motions are fully briefed and ripe for decision.  In ruling on these motions, the court has considered the following:  (1) plaintiff's second amended complaint, ECF No. 34 (complaint); (2) the AR, ECF Nos. 26, 30; (3) plaintiff's motion for judgment on the AR, ECF No. 32; (4) defendant's response to plaintiff's motion for judgment on the AR, cross-motion for judgment on the AR, and motion to strike, ECF No. 35; (5) intervenor-defendant's response to plaintiff's motion for judgment on the AR, and its cross-motion for judgment on the AR, ECF No. 36; (6) plaintiff's reply in support of its motion for judgment on the AR, and its response to defendant's and intervenor-defendant's cross-motions for judgment on the AR, ECF No. 37; (7) defendant's reply in support of its cross-motion for judgment on the AR and motion to strike, ECF No. 38; and (8) intervenor-defendant's reply in support of its cross-motion for judgment on the AR, ECF No. 40.

For the reasons set forth below:  (1) plaintiff's motion for judgment on the AR, ECF No. 32, is **DENIED**; (2) defendant's cross-motion for judgment on the AR and motion to strike, ECF No. 35, are **GRANTED**; and (3) intervenor-defendant's cross-motion for judgment on the AR, ECF No. 36, is **GRANTED**.

I.      Background

        A.      The RFQ and Amendments

On May 1, 2017, the agency issued Request for Quotation No. HSCEMS-17-Q-00010 (RFQ) seeking "General Translation, Transcription, and Interpretation Services," under its Title III, Monitoring and General Translation & Transcription Services program.  ECF No. 26-2 at 530.  As explained in the AR,

> Title III of the Omnibus Crime Control and Safe Street Act of 1968 (Wiretap Act) as amended provides the statutory framework that governs real-time electronic surveillance of the contents of communications.  The Title III act establishes procedures agencies must follow to obtain a federal court order to authorize the interception of oral, wire and electronic communications (known as Title III or wiretap).  This act regulates how law enforcement agents can use and further disclose information obtained under a Title III order.

2

Id. at 205.  These services are presently provided by multiple vendors, but the agency now intends to consolidate the services with one vendor to increase efficiency.  See id. at 206.  Both plaintiff and intervenor-defendant (MVM) are incumbent contractors.  ECF No. 26-3 at 282.

The agency issued Amendment 1 to the RFQ on May 23, 2017, see ECF No. 26-2 at 603, and awarded the contract to MVM on August 4, 2017, see id. at 36.  In response to four bid protests filed with the Government Accountability Office (GAO), the agency took corrective action, see id. at 207, and the GAO dismissed the protests as moot, see ECF No. 26-1 at 177.  As part of the corrective action, the agency issued two additional amendments—Amendment 2 and Amendment 3—to the RFQ.  Amendment 3, "for all intents and purposes, replaced the original RFQ."  ECF No. 35 at 11 (citing ECF No. 26-1 at 233).  Amendment 3, in several respects, reduced the scope of the procurement.  For example, it removed braille from the list of languages and eliminated the request for interpretation services generally.  See ECF No. 26-1 at 236, 239-43, 263.

The performance work statement (PWS) that accompanied Amendment 3 stated that "[t]he contractor shall furnish all personnel and all necessary equipment, materials and supplies, transportation, security clearance, and background investigation verification necessary to perform Title III Monitoring and General Translation and Transcription Services."  Id. at 239.  The PWS also stated that "ICE will require local linguists/translators for Tier I and Tier II languages in certain areas of the [United States]. This will be determined at the case assignment level."  Id. at 247.  It also noted that "[a]ll services required in support of Title III wiretap intercepts will take place in a Government controlled facility."  Id. at 248.

Amendment 3 further required that each submission conform to the following format:

> The Technical submission shall not exceed 35 pages on 8.5 X 11 paper in Times New Roman 12 pt. Font and 1 inch margins (excluding resumes, Key Personnel Certification, and Past Performance Questionnaires).  Vendors are permitted to use different fonts and sizes for graphs, illustrations, tables, etc. permitted they remain legible.

Id. at 261 (emphasis in original).

B.      The Evaluation Criteria

The RFQ stated that the task order would be awarded "to the responsible GSA Schedule Holder . . . whose quote for the services described herein conforms to the solicitation and represents [the] best overall value to the Government."  Id. at 260.  The evaluation factors include:  Technical Approach, Management Approach, Past

Performance & Experience, and Price.  Id.  Under the terms of the RFQ, "[n]on-price factors, when combined, are significantly more important than Price," but "[a]s the technical evaluations become more equal, price becomes more important in making the award determination."  Id.  In addition, the RFQ stated that "[i]n the event that two or more quotes are determined to have received the same technical rating, award may be made to the lower priced [offeror]."  Id.

### 1.      Technical Approach and Management Approach

The agency began its evaluation of each offeror's technical approach by determining "the extent to which the Offeror conveys its understanding of the tasks identified in the Performance Work Statement (PWS)."  Id. at 261.  The agency also evaluated "whether the proposed approach is sound, practical, and feasible to accomplish the requirements, and the Offeror's demonstrated ability to staff the ICE Title III Monitoring and General Translation and Transcription Services program."  Id.  The technical approach factor included a review of two sub-factors:  an offeror's technical capabilities, and its quality control plan.  See id.

With regard to each offeror's management approach, the agency "assess[ed] the extent to which the Offeror's approach provides a thorough and relevant plan for managing, overseeing, and accomplishing performance as required in the RFQ and PWS."  Id. at 262.  In addition, the agency "evaluate[d] the Offeror's approach for obtaining, allocating, monitoring, and controlling all resources required to ensure successful performance."  Id.  The management approach also addressed four sub-factors:  transition plan, organizational structure and staffing plan, invoicing, and capability and experience of key personnel.  Id. at 262-63.

Both the technical approach and the management approach of each offeror was rated as Excellent, Good, Acceptable, Marginal, or Unacceptable.  Id. at 265.

### 2.      Past Performance and Experience

The agency evaluated offerors' past performance based on responses to a past performance questionnaire.  Id. at 263.  The RFQ described relevant experience to include the successful provision of translation and transcription services of "similar size, scope and complexity as described in the PWS," within the preceding five years.  Id.  Sources of information for evaluation under this factor included:  "information provided by the Offeror, information obtained from past performance questionnaires, and information from any other sources available to the Government."  Id.  The agency rated offerors under this factor as:  Substantial Confidence (Outstanding), Satisfactory Confidence (Satisfactory), Limited Confidence (Marginal), No Confidence (Unsatisfactory), and Unknown Confidence (Neutral).  Id. at 266.

4

3.     Price

Offerors were required, under the terms of the RFQ to present proposed prices in a specified format, and to clearly indicate any assumptions included in their calculations. See id. at 263.   The agency instructed offerors to include a list of forms and attachments as part of its price quote, including "Attachment D – Pricing Evaluation Spreadsheet," which would "be used solely for evaluation of price for award purposes only." Id. at 264. Attachment D addresses rates for Tier I and Tier II languages, and states on the top of each page that "[o]nly languages in Tier I & II will be used in calculating a vendor's total evaluated price for award purposes." Id. at 286-90.  The RFQ also specifies that "[p]rice quotations will be evaluated in accordance with FAR 8.404(d)," and that "[e]ach Offeror's Total Evaluated Price will be evaluated utilizing Attachment D – Pricing Evaluation Spreadsheet." Id. at 264.  Prices for Tier III languages were "evaluated for reasonableness separately from the evaluation of price for award purposes." Id.

C.     Award Decision Following Amendment 3

Both plaintiff and MVM submitted revised quotes based on Amendment 3.  Id. at 236; ECF No. 26-2 at 246-369 (plaintiff's revised quote); id. at 370-467 (MVM's revised quote).  Two additional offerors submitted quotes, but the agency deemed both ineligible for award.  ECF No. 26-1 at 177.  Two teams reviewed the quotes and issued reports to the Source Selection Authority (SSA).  The Technical Evaluation Team (TET) issued its report on April 11, 2018.[2]  See ECF No. 26-2 at 153-174.  The Price Evaluation Team (PET) issued its report on June 15, 2018.  See id. at 175-77.  The SSA then reviewed the TET and PET reports and recommended selecting MVM for award.  See id. at 178-203 (award decision memorandum).

1.     Technical Evaluation Team Report

In its report, the TET assigned both plaintiff and MVM the highest rating for each of the non-price evaluation factors.  The report included a table summarizing the TET's conclusions, as reproduced here:

| Vendor | Technical Approach | Management Approach | Past Performance & Experience |
|---|---|---|---|
| Metropolitan Interpreters and Translators, Inc. (Metro) | Excellent | Excellent | Substantial Confidence |

---

[2]     The first page of the TET report records the date as March 12, 2018, but the final page, which includes signatures from the team members, indicates the report was finalized on April 11, 2018.  See ECF No. 26-2 at 153, 174.

| MVM, Inc. | Excellent | Excellent | Substantial Confidence |

Id. at 155.  The TET identified no weaknesses, deficiencies, or risks in either plaintiff's or MVM's quote.  See id. at 157, 160, 162 (evaluation of plaintiff's quote); id. at 166, 170, 172 (evaluation of MVM's quote).

The TET's analysis of plaintiff's quote was detailed and notably positive.  With regard to plaintiff's technical approach, the TET stated that plaintiff demonstrated both "exceptional understanding of the Government's goals and objectives," and "significant strengths within their proposal regarding their Technical Capability and Quality Control Plan that would benefit the Government if selected for award."  Id. at 155.  The TET found that plaintiff's proposed management approach "established a thorough and exceptional understanding of the requirements defined in the PWS for the Transition Plan, Staffing, Invoicing capability and experience of Key personnel."  Id. at 157.  And after reviewing Contractor Performance Assessment Reports (CPARs) and the nature and scope of plaintiff's past performance submissions, the TET concluded that plaintiff's "past performance and experience appear[ ] to be exceptional."  Id. at 160.

The TET's evaluation of MVM was similarly detailed and positive.  The TET's conclusions with regard to MVM's quote were nearly identical to its conclusions with regard to plaintiff's quote.  The TET found that:  MVM's technical approach "demonstrate[d] an exceptional understanding of the Government's goals and objectives,"  id. at 162; MVM's management approach "demonstrate[d] a thorough and exceptional understanding of the requirements in the PWS for the Transition Plan, Staffing, Invoicing capability and experience of Personnel," id. at 166; and MVM's "past performance and experience appear[ ] to be exceptional," id. at 170.

The TET concluded its report as follows:

Based on the results of the technical evaluation, TET recommends award of the single Task Order to either MVM or Metro as both vendors provided a proposal with a clear and concise direction on how they would transition from a multi-vendor BPA [Blanket Purchase Agreement] system down to a single provider.  [Each] vendor[']s proposal methodically details its approach in ensuring quality control and demonstrated a clear understanding of its importance to ICE/HIS's [Homeland Security Investigations] mission success. . . .  In conclusion, the TET team is fully confident that either MVM or Metro can perform the tasks required for this contract.

Id. at 173.

2.      Price Evaluation Team Report

In accordance with the RFQ, the PET compared specific price proposals for Tier I & Tier II languages based on responses to a pricing spreadsheet, while making a "fair & reasonableness determination" for Tier III languages, which were not included on the spreadsheet. Id. at 175. The PET stated that "MVM submitted the lower price quote with a total evaluated price of $205,803,583.85." Id. at 176. Plaintiff's price quote was 3.28% higher, "with a total evaluated price of $212,957,791.38." Id. The PET further stated that the prices quoted by both plaintiff and MVM were within the guidelines previously determined by the General Services Administration (GSA) to be "fair and reasonable," and that "[e]ach of the contractors further discounted their GSA Schedule rates." Id.

On June 15, 2018, the SSA determined that it was in the government's best interest to select MVM, and awarded MVM the contract. See id. at 178-203.

D.      Fifth and Sixth GAO Protests

Following the initial award decision, plaintiff filed two bid protests before the GAO. The first protest was filed on June 25, 2018. See ECF No. 26-1 at 7. The agency acknowledged an administrative error and took corrective action, and the GAO dismissed the protest as moot. See id. at 28-30, 34. Following corrective action, the agency again awarded the contract to MVM. See id. at 304. On July 27, 2018, plaintiff filed a second protest challenging the agency's technical and price evaluations, and its best value determination. See id. at 35. Upon discovery of another administrative error, the agency took corrective action for a second time, and the GAO dismissed the protest as moot. See id. at 60-61, 64-65; ECF No. 30-1 at 15.

E.      Final Award Decision

The SSA made its final award decision on December 21, 2018. See ECF No. 26-2 at 204-45. After a lengthy comparison of plaintiff's and MVM's proposals, the SSA determined that "the technically excellent-rated and lower-priced offeror, MVM presents the best value to the Government." Id. at 244. In reaching this conclusion, the SSA reviewed the two corrective actions, along with the TET report and the PET report. Id. at 214-30, 231-33.

1.      Evaluation of Plaintiff's Non-Price Factors

The SSA found that plaintiff's quote "proposed features that exceed the government's requirements," "contains more than one strength," and "[n]o weaknesses." Id. at 214. The SSA identified "numerous features and strengths" in plaintiff's technical approach, including: (1) plaintiff's "13 years of extensive history and experience

performing monitoring, analysis, translation and transcription services with ICE"; (2) plaintiff's [ ]; (3) plaintiff's "nationwide network of secure transcription centers," and "large linguistic pool"; and (4) plaintiff's [ ].  Id. at 215-16.

The SSA assessed that plaintiff's management approach "demonstrate[d] an exceptional understanding of the Government's goals and objectives through their transition, organization and proposed staffing, invoicing, and key personnel."  Id. at 219. In particular, the SSA identified as benefits the "expertise and knowledge" of plaintiff's personnel, the employees at various locations, and plaintiff's ability to recruit in a manner that would reduce costs and allow for rapid vetting.  Id. at 218.

And plaintiff's past performance and experience gave the SSA "substantial confidence that they can perform the services required."  Id. at 221.  Specifically, the SSA considered the "scope and complexity" of the services performed under the referenced contracts as relevant, and reviewed plaintiff's successful performance of the same.  See id. at 219-20.

2.      Evaluation of MVM's Non-Price Factors

As with plaintiff's quote, the SSA found that MVM's technical approach "proposed features that exceed the government's requirements," and "identified several strengths and no weaknesses."  Id. at 221-22.  The SSA highlighted both MVM's [ ] as a means of facilitating efficient performance, and the systems in place for recruiting qualified linguists.  Id. at 224.  In addition, the SSA was impressed by MVM personnel's depth of experience, its efforts to "create cost efficiencies," its plans to add personnel and translation centers, its process for determining appropriate staffing levels, and its quality control process.  Id.

According to the SSA, MVM's management approach "proposes features that exceed the government's requirements and its quote demonstrates an exceptional understanding of the goals and objectives of this acquisition including requirements in the PWS for the transition plan, staffing, invoicing, as well as capability and experience of Key Personnel."  Id. at 225.  The evaluation "identified several strengths and no weaknesses" with regard to the proposed management approach.  Id.  Of particular note was the strength of MVM's transition plan, organization structure, recruiting efforts, and invoicing procedures.  Id. at 227.

The SSA determined that, with regard to past performance and experience, the "scope and complexity of services performed" under each of the referenced contracts made those contracts relevant.  Id. at 228-29.  The SSA also determined that each contract was performed successfully.  Id.  As a result, the SSA had "substantial confidence that [MVM] [could] perform the services required."  Id. at 230.

3.      Price Evaluation

In evaluating the prices included in each quote, the SSA noted that all prices were within GSA guidelines, and that both plaintiff and MVM had offered discounts.  See id. at 231.  The SSA also stated that rates for Tier III languages "were evaluated for reasonableness separately from the evaluation of price for award purposes."  Id.  A comparison of the total evaluated price for Tiers I and II demonstrated that MVM's price, at $205,803,583.85, was lower than plaintiff's, at $212,957,791.23.  Id. at 232.

4.      Comparative Analysis

The SSA then conducted a comparative analysis of the two quotes.  Therein, the SSA made clear that both plaintiff's and MVM's quotes were very strong.  The SSA noted the "significant value" offered by plaintiff's technical and management approaches, as well as the "outstanding qualifications" of plaintiff's personnel, and its "robust recruitment and staffing plan aimed at a seamless transition period and increasing utilization of local linguists to reduce travel costs."  Id. at 233.  The SSA also found that MVM "presented a well-written quote with well-identified strengths."  Id.  In particular, the SSA recognized MVM's quality control plan and automated processes as strengths. Id.

5.      Best Value Assessment

After a review and comparison of the quotes, the SSA engaged in a lengthy best value assessment.  The following summary table appears at the beginning of the assessment.

| Vendor | Technical Approach | Management Approach | Past Performance & Experience | Total Evaluated Price |
|---|---|---|---|---|
| MIT | Excellent | Excellent | Substantial Confidence | $212,957,791.23 |
| MVM | Excellent | Excellent | Substantial Confidence | $205,803,583.85 |

Id. at 234.  The SSA repeated much of the information included in its review of the quotes, and ultimately determined that given the technical parity of the quotes, there was no reason to pay a premium for plaintiff's services.  See id. at 234-44.  In its final recommendation, the SSA concluded that "[b]ased on the technical and past performance evaluations along with the price analysis contained herein, the Government has determined that award to the technically excellent-rated and lower-priced offeror, MVM, presents the best value to the Government."  Id. at 244.

Following this award decision, plaintiff filed another GAO protest on December 31, 2018, see ECF No. 26-1 at 66-173, which was denied on May 14, 2019, see ECF No. 26-3 at 265.  Plaintiff then filed this case on May 20, 2019.  See ECF No. 1 (complaint).

II.     Legal Standards

A.      Bid Protest Standard of Review

As the United States Court of Appeals for the Federal Circuit has stated, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A):  a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)).  The court's analysis of a "bid protest proceeds in two steps."  Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005).  First, the court determines, pursuant to the Administrative Procedure Act standard of review, whether the "agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law."  Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907-08 (Fed. Cir. 2013) (citing 28 U.S.C. § 1491(b)(4) (adopting the standard of 5 U.S.C. § 706)).  If the court finds that the agency acted in error, the court then must determine whether the error was prejudicial.  See Bannum, 404 F.3d at 1351.

To establish prejudice, "a protester must show 'that there was a substantial chance it would have received the contract award but for that error.'"  Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (quoting Statistica, Inc. v. Christopher, 102 F.3d 1577, 1582 (Fed. Cir. 1996)).  "In other words, the protestor's chance of securing the award must not have been insubstantial."  Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003).  The substantial chance requirement does not mean that plaintiff must prove it was next in line for the award but for the government's errors.  See Sci. & Mgmt. Res., Inc. v. United States, 117 Fed. Cl. 54, 62 (2014); see also Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996) ("To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract.").  Demonstrating prejudice does require, however, that the plaintiff show more than a bare possibility of receiving the award.  See Bannum, 404 F.3d at 1358 (affirming the trial court's determination that the plaintiff had not demonstrated a substantial chance of award when its "argument rest[ed] on mere numerical possibility, not evidence").

Given the considerable discretion allowed contracting officers, the standard of review is "highly deferential."  Advanced Data Concepts, 216 F.3d at 1058.  De minimis errors in the procurement process do not justify relief.  Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 1000 (Fed. Cir. 1996) (citing Andersen Consulting v. United States,

959 F.2d 929, 932-33, 935 (Fed. Cir. 1992)).  The bid protest plaintiff bears the burden of proving that a significant error marred the procurement in question.  Id. (citing CACI Field Servs., Inc. v. United States, 854 F.2d 464, 466 (Fed. Cir. 1988)).  Examples of arbitrary and capricious agency action include "when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Alabama Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)) (alteration in original).  The court will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974) (citation omitted).

The agency's technical evaluation of proposals is reviewed with considerable deference because "technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess."  E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996) (citations omitted).  Indeed, the Federal Circuit describes an agency's technical evaluation of proposals as "an inherently judgmental process requiring deference."  Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1339 (Fed. Cir. 2004).  "'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'"  Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971)).

B.     Permanent Injunctive Relief

As the Federal Circuit has held:

In deciding whether a permanent injunction should issue, a court considers: (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (citing Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 546 n.12 (1987)).

III.    Analysis

A.    Defendant's Motion to Strike

Plaintiff filed two exhibits along with its motion for judgment on the AR:  (1) the declaration of Ariel H. Collis, a consultant who was "asked by [plaintiff's counsel] to estimate the total cost to the [agency] for Translation and Transcription Services for Tier III languages for [plaintiff] and MVM, Inc. using pricing given in their proposals for the [RFQ]," ECF No. 32-2 at 2-24; and (2) a table, apparently created by plaintiff, purporting to illustrate inconsistencies in the technical evaluations at issue, ECF No. 32-3 at 2-5. Defendant has moved to strike the exhibits because "these documents are not part of the administrative record."  ECF No. 35 at 53.  In response, plaintiff argues that Ms. Collis's declaration is necessary for effective judicial review, see ECF No. 37 at 31-33; and that plaintiff's chart is admissible as a summary pursuant to Federal Rule of Evidence 1006, see id. at 33-34.

The Federal Circuit has established that supplementation is only appropriate when the auxiliary materials are necessary to allow the court to conduct "meaningful judicial review."  Axiom Res. Mgmt. v. United States, 564 F.3d 1374, 1379-80 (Fed. Cir. 2009). In this case, Ms. Collis's calculations do not serve that end.  The proper standard of judicial review in this case is the "highly deferential" inquiry as to whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  Advanced Data Concepts, 216 F.3d at 1058.   The court must not second guess the agency's technical judgments.  See E.W. Bliss, 77 F.3d at 445; Galen, 369 F.3d at 1339.  "'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'"  Honeywell, 870 F.2d at 648 (quoting M. Steinthal, 455 F.2d at 1301).  The court has no need for independent calculations in order to determine whether the agency acted arbitrarily or capriciously, or abused its discretion in awarding the contract to MVM.

The court likewise rejects plaintiff's argument that its chart—which summarizes alleged inconsistencies in the evaluation process—is necessary due to the volume of material that it synthesizes.  Federal Rule of Evidence 1006 states, in its entirety:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court.  The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

The court does not accept plaintiff's argument that "the AR is too voluminous for Metro" to have addressed its contents in its motion for judgment on the administrative record. ECF No. 37 at 34.  Plaintiff's chart is five pages long, and cites a total of only eight pages in the AR.  See id. (citing ECF No. 26-2 at 163-64, 252-53, 272-75).  If plaintiff needed additional space to address these matters as part of its written argument, it should have sought leave to exceed the page limit set by the rules of this court.

    Accordingly, defendant's motion to strike is **GRANTED**.

    B.     The Agency Did Not Err in Accepting MVM's Proposal

    The RFQ required offerors to submit their technical proposals in accordance with the following format:

> The Technical submission shall not exceed 35 pages on 8.5 X 11 paper in Times New Roman 12 pt. Font and 1 inch margins (excluding resumes, Key Personnel Certification, and Past Performance Questionnaires).  Vendors are permitted to use different fonts and sizes for graphs, illustrations, tables, etc. permitted they remain legible.

ECF No. 26-1 at 261 (emphasis in original).  Plaintiff argues that "MVM's quote circumvented the RFQ's page limitation by using smaller font sizes than permitted by the RFQ for narrative text, i.e., anything that was not a graph, illustration, table, etc."  ECF No. 32-1 at 14.

    According to plaintiff's calculations, "39% of the text used in MVM's technical quote is 9 point Arial Narrow font or smaller."  Id. at 15.  Plaintiff claims that "[m]any of the sections of MVM's technical quote that are in a smaller font size have no identifying label such as 'table' nor are they graphs or illustrations."  Id. (citing ECF No. 26-2 at 382, 384-85).  In addition, plaintiff argues that MVM "interspersed boxes filed with narrative text into its technical quote."  Id.  Plaintiff posits that "[h]ad MVM complied with the RFQ's instructions and used the 12-point font required for narrative text, its technical quote would have surpassed the page limitation of 35 pages."  Id.

    Plaintiff claims that the agency should have rejected MVM's quote on this basis. See id.  As support for this position, plaintiff cites to a number of cases affirming an agency's decision to exclude proposals when the offeror failed to comply with formatting requirements.  See id. at 14-15 (citing Leader Commc'ns, Inc. v. Fed. Aviation Admin., 757 F. App'x 763 (10th Cir. 2019); Tetra Tech AMT v. Dell Servs. Fed. Gov't, 128 Fed. Cl. 169 (2016); Navarro Research & Eng'g, Inc. v. United States, 106 Fed. Cl. 386, 411 (2012)).

Defendant argues that the technical evaluators appropriately used their broad discretion to determine whether MVM's quote met the formatting requirements. ECF No. 35 at 28. The court agrees. The RFQ expressly permitted vendors "to use different fonts and sizes for graphs, illustrations, tables, etc. permitted they remain legible." ECF No. 26-1 at 261. The pages cited to by defendant as examples of MVM's alleged misconduct, ECF No. 26-2 at 382, 384-385, include sections that both could reasonably be interpreted as tables and are legible. Moreover, as defendant correctly notes, the permissible deviations from the font-size requirement ends with "etc.," a term that is, by definition, flexible. As such, MVM did not clearly violate the stated formatting requirements, and the agency did not err in accepting MVM's quote.

C.  The Agency's Technical Evaluation Was Not Irrational, Arbitrary, or Capricious

1.  Technical Approach Evaluation

According to plaintiff, the technical approach section of its quote was unfairly evaluated in three respects: (1) plaintiff's "nationwide service locations" should have been considered a strength as compared to MVM's more limited locations, specifically with regard to plaintiff's ability to reduce temporary duty (TDY) costs, ECF No. 32-1 at 18-20; (2) the SSA disparately treated plaintiff's and MVM's technical approaches with regard to TDY costs, see id. at 20-21; and (3) plaintiff should have been given more credit for its ability to provide staff for the agency's assignments, see id. at 21-22. Each of these arguments lacks merit.

a.  Evaluation of Plaintiff's Nationwide Service Locations

First, plaintiff insists that the SSA "ignored the TET's findings that Metro's existing translation service centers throughout the country exceeded the RFQ requirements." Id. at 18. The record contradicts plaintiff's assertion. The SSA noted plaintiff's "nationwide network of secure transcription centers located in [ ]," as well as the fact that its "subcontractors have four additional secure locations in [ ]." ECF No. 26-2 at 215. Moreover, the SSA explained why it did not value these multiple locations more highly:

The benefit of this feature for both offerors is limited by the nature of the workflow between ICE and is vendors. Live Title III intercept work is only performed at law enforcement locations, not offsite contractor facilities. Typically, translation/transcription requirements are either shipped or commonly e-mailed to the vendors for completion. Multiple secure centers are not necessary to perform that requirement. The requirement is for a vendor to provide services 24 hours per day, 7 days per week, regardless of

the number, location or time-zone of secure locations. What is important is
that work is timely completed in a secure facility.

Id. at 237. The SSA did not fail to consider the issue, nor is the SSA's explanation
implausible or counter to the evidence in the record. See Alabama Aircraft, 586 F.3d at
1375. Although plaintiff clearly disagrees with the manner in which the SSA evaluated
this aspect of the technical approach, the court will not second-guess the agency's
discretionary determinations. See E.W. Bliss, 77 F.3d at 449; Honeywell, 870 F.2d at
648.

Plaintiff also argues that the SSA irrationally disregarded the impact of its multiple
locations on TDY costs. But the record does not support plaintiff's claim. The SSA
discussed plaintiff's ability to reduce TDY costs at several points in its analysis. See,
e.g., ECF No. 26-2 at 215 (noting that plaintiff's "large linguistic work pool . . . reduce[s]
the number of temporary duty (TDY) linguists and associated costs"); id. at 218 ("This
would allow [plaintiff] to reduce potential TDY costs"); id. at 241 ("The Government
anticipates that [plaintiff's] organizational and staffing structure, concentrated in high-
usage markets would enable [plaintiff] to reduce personnel and TDY expenses"). The
SSA simply disagreed that the potential reduction in TDY costs was worth paying
plaintiff's premium price. See id. at 242 ("Both [organizational and staffing] approaches
are expected to provide substantial benefit to the Government; however, considered in
total, MVM's proposed features compared to MIT's features at a $7 Million lower price
constitutes a better value to the Government."). The SSA reached a conclusion that the
court does not find to be irrational. Again, the court will not second-guess the SSA's
judgment.

> b.    SSA's Treatment of Plaintiff's Current Locations Compared
>        with Its Treatment of MVM's Potential Future Locations

Next, plaintiff claims "the arbitrary and capricious nature of the SSA's conclusion
is amplified by its disparate treatment of plaintiff with respect to MVM's proposal." ECF
No. 32-1 at 20. According to plaintiff, the technical approach evaluation was unfair
because, despite the SSA's failure to properly credit plaintiff for its network of locations,
"the agency" at the same time considered MVM's potential future locations to be a
strength. Id. at 21 (citing ECF No. 26-2 at 164). The portion of the record to which
plaintiff cites in support of its argument, however, is the TET report, not the SSA award
decision. The SSA, for its part, noted that the effect of multiple transcription centers on
both proposals was the same: "The benefit of this feature for both offerors is limited by
the nature of the workflow between ICE and its vendors." ECF No. 26-2 at 237
(emphasis added). As such, the record demonstrates that the agency treated plaintiff and
MVM equally, not disparately, as to the effect of multiple service locations on the
strength of their respective quotes. The court does not credit plaintiff's claim to the
contrary.

c.    MVM's Ability to Perform

Finally, plaintiff claims that the SSA's technical approach evaluation was irrational because it "did not assess MVM's ability to staff and provide all required services." ECF No. 32-1 at 21.  Pursuant to the RFQ, the agency was required to evaluate whether "the Offeror's demonstrated ability to staff the ICE Title III Monitoring and General Translation and Transcription Services program," and "the extent to which the Offeror . . . has the capability to provide all required services at all required locations." ECF No. 26-1 at 261.  As defendant points out, "[a]lthough the TET and SSA may not have parroted back this exact language from the RFQ in their evaluations, the administrative record makes clear that ICE determined that MVM did, in fact, have the technical 'capability to provide all required services at all required locations.'"  ECF No. 35 at 33-34.  See, e.g., ECF No. 26-2 at 162 (TET stating that "MVM's Technical Approach indicates the offeror exceeds the minimum requirements"); id. at 164 (TET stating that "MVM has developed a [ ] to ensure the appropriate number of linguists with the right skill sets are used to efficiently execute all tasks and meet all performance requirements in a timely manner"); id. at 221 (SSA stating that "MVM proposed features that exceed the government's requirements"); id. at 224 (SSA stating that "MVM has developed a [ ] to ensure the appropriate number of linguists with the right skill sets are used to efficiently execute all tasks and meet all performance requirements in a timely manner"); id. at 237 (SSA stating that "MVM proposes its secure facility in [ ]," and "[m]ultiple secure centers are not necessary to perform the requirement").

Plaintiff concludes its argument on this point as follows:  "ICE's failure to recognize the technical superiority of Metro's ability to presently meet Factor 1's requirement for a demonstrated ability to staff the ICE Title III program and capability to provide all required services at all required locations was irrational and arbitrary and capricious as a result."  ECF No. 32-1 at 22.  This statement is revealing in several respects.  First, plaintiff misrepresents the applicable standard of review—the court does not review an agency's award decision to determine whether the agency chose the "technically superior" quote.  The court is, in fact, prohibited from substituting its own judgment for that of the agency.  See Honeywell, 870 F.2d at 648 ("'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'") (quoting M. Steinthal, 455 F.2d at 1301).  In addition, plaintiff equates the agency's failure to "recognize the technical superiority" of its proposal with an irrational or arbitrary decision.  See ECF No. 32-1 at 22.  Plaintiff's strong disagreement with the agency's discretionary judgment does not make the award to MVM an irrational one; nor does the record support plaintiff's position.

2.      Management Approach Evaluation

Plaintiff next argues that "ICE did not conduct a fair consideration of Metro's and MVM's technical quotes under Factor 2, Management Approach, as ICE's evaluation expressly departed from the stated criteria and overlooked indisputable strengths in Metro's quote while recognizing the same features as strengths in MVM's quote to Metro's prejudice." Id. Specifically, plaintiff claims that the agency: (1) "departed from the RFQ's stated evaluation criteria by refusing to consider TDY costs savings offered by Metro's proposal," id.; and (2) improperly "disregarded and/or otherwise minimized, the strengths in Metro's proposal acknowledged by the TET related to Metro's already-cleared ICE employees," id. at 24.

a.      Consideration of TDY Cost Savings

The RFQ required the agency to evaluate each offeror's quote for "the geographical locations of linguists and its ability to minimize travel costs." ECF No. 26-1 at 262. Consideration of this criteria was included as part of the agency's review of the non-rated sub-factor titled "Organizational Structure and Staffing Plan." Id. Plaintiff does not argue that the SSA failed to consider the potential that plaintiff's quote would allow for TDY cost savings; instead, plaintiff disagrees with the contracting officer's characterization of those costs as "speculative," and argues that the SSA did not properly value its potential to minimize such costs. ECF No. 32-1 at 23 (quoting ECF No. 26-2 at 136). Defendant argues that the RFQ did not require the SSA to consider actual TDY savings, but rather was required to consider the more general "ability" of each offeror to minimize TDY expenses. ECF No. 35 at 35; see also ECF No. 26-1 at 261-64. In its reply, plaintiff characterizes defendant's response as "semantic, but ultimately implausible and illogical." ECF No. 37 at 23.

Plaintiff does not clearly articulate, however, what it believes the SSA should have done differently other than to value plaintiff's purported TDY cost savings more highly than it did. The SSA clearly considered plaintiff's ability to minimize travel costs, as required by the RFQ. See, e.g., ECF No. 26-2 at 218 ("MIT operates and has employees at various locations where nearly [ ] of ICE Title III work originates. This would allow MIT to reduce potential TDY costs and make it easier to recruit local linguists."). Ultimately, the SSA found that any TDY cost savings were too uncertain to dramatically impact the award decision. The SSA concluded that "each vendor proposed features designed/intended to save the Government money," but "due to the nature of this work (unknown labor hours, TDY, cancellation), an exact estimate of potential cost saving is impossible to determine here." Id. at 242. The SSA also found that "[b]ecause each vendor proposes significant staffing where approximately [ ] of ICE's Title III cases originate, the government does not expect that [plaintiff] will be able to reduce TDY expenses under its staffing and technical approach significantly more than MVM,

17

especially considering [plaintiff's] approximately $7 Million higher price over MVM."
Id.

The court understands that plaintiff vehemently disagrees with the SSA's analysis, but such disagreement does not render the evaluation arbitrary, capricious, or irrational, and the court will not substitute its judgment for the SSA's on this point. See Honeywell, 870 F.2d at 648 ("'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'") (quoting M. Steinthal, 455 F.2d at 1301).

b.      Employees Previously Cleared by ICE

Plaintiff also challenges the evaluation of its management approach because, it argues, the SSA "disregarded and/or otherwise minimized, the strengths in Metro's proposal acknowledged by the TET related to Metro's already-cleared ICE employees." ECF No. 32-1 at 24.  Plaintiff claims the SSA did not properly evaluate the following: (1) the large number of trained, already vetted linguists who work for plaintiff in "high usage markets," id.; (2) the fact that some of the linguists to whom MVM claims access for staffing are actually employed by a subcontractor, id. at 25-26; (3) the relative merits of plaintiff's and MVM's staffing proposals, id. at 27-28; and (4) MVM's restriction on allowing employees to work double-shifts, id. at 28.

Each of these arguments is fundamentally rooted, again, in plaintiff's disagreement with the SSA's discretionary judgments.  According to plaintiff, the SSA failed to take into consideration the various strengths reflected in plaintiff's management approach, particularly as compared to MVM's.  See, e.g., id. at 25 (stating that the TET discussed the number of linguists that plaintiff has in relevant markets as a strength, but the SSA did not); id. at 26 (faulting the TET for failing to note the strength of its quote with regard to vetted linguists with sufficient specificity, while overstating MVM's strength on this point); id. (criticizing the agency for considering linguists available to MVM [ ] as a strength); id. at 27 (stating that the agency failed to "give Metro a strength for its unique strategies for identifying and obtaining Tier III linguists," while giving MVM a strength for its proposed recruitment strategy); id. at 28 (claiming that the SSA improperly assigned MVM a strength for its policy of [ ] when the RFQ required the same).

The record clearly establishes that the SSA took the TET report into consideration. See ECF No. 26-2 at 218 (noting the "evaluation team['s]" conclusions regarding plaintiff's management approach).   Moreover, the SSA acknowledged the value of plaintiff's experienced workforce. See id. at 216 ("MIT's Management Approach provides a thorough and exceptional understanding of the requirements in the PWS as evidenced in its proposed transition plan, staffing, invoicing, and capability and

18

experience of Key Personnel, which include features that exceed the government's requirements."); id. at 218 ("MIT maintains an additional pool of [ ] [who] are not currently vetted for ICE [but] who can be rapidly vetted by ICE to meet any time sensitive language needs and rapidly deployed.").

The fact that the SSA did not treat every detail of its proposal in the manner the plaintiff considers most advantageous to its evaluation does not justify the court's intervention. Challenges involving "the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess." E.W. Bliss, 77 F.3d at 449. "[N]aked claims" of disagreement with evaluations, "no matter how vigorous, fall far short of meeting the heavy burden of demonstrating that the findings in question were the product of an irrational process and hence were arbitrary and capricious." Banknote Corp. of Am. v. United States, 56 Fed. Cl. 377, 384 (2003), aff'd, 365 F.3d 1345 (Fed. Cir. 2004). Plaintiff's challenges to the SSA's judgment in assigning—or not assigning—various strengths to its proposal fall squarely within the realm of minutiae into which the court must not intrude.

### D. Plaintiff Has Failed to Demonstrate that the Agency Unfairly Conducted Its Technical Evaluation

Plaintiff accuses the agency of failing to evaluate the quotes "fairly and even-handedly." ECF No. 32-1 at 28. Specifically, plaintiff claims that "ICE ascribed strengths to features of MVM's quote while ignoring the similar, if not identical, features of Metro's quote." Id. at 29. There are no examples of unequal treatment in this section of plaintiff's brief; instead plaintiff cites to a chart attached thereto as an exhibit. See id. The court, however, has already determined that this chart is not properly part of the record in this case. While the court agrees that the SSA was required to treat the offerors equally, plaintiff does not support its claim that the SSA did otherwise by referring to evidence that is in the record. The court will not supply argument that plaintiff itself did not make on this point, and therefore, declines to credit this claim by plaintiff. See Grumman Data, 88 F.3d at 1000 ("A protestor bears the burden of proving error in the procurement process sufficient to justify relief.") (citing CACI, 854 F.2d at 466).

### E. The Agency's Past Performance Evaluation Was Not Irrational, Arbitrary, or Capricious

Plaintiff claims that the SSA acted irrationally by assigning MVM a "Substantial Confidence" rating for its past performance, despite the fact that MVM had a history of receiving lower ratings. See ECF No. 32-1 at 30. For example, the SSA noted that "MVM was rated 'Marginal' on Business Relations and Utilization of Small Business" on a past contract. ECF No. 26-2 at 229. The SSA noted, however, that the "Business Relations" factor "is no longer used in the current version of the system," id., and

"consider[ed] MVM's Marginal ratings for Small Business Utilization irrelevant to the current requirement, because the current requirement does not involve any small business component, and Small Business Utilization does not reflect on components of prior performance relative here, such as Quality." Id. at 230.  The SSA further noted that "[n]either vendors' [Past Performance Retrieval System (PPIRS)] ratings for Small Business Utilization were considered relevant under this evaluation." Id.  Plaintiff persists, however, and takes issue with the fact that the TET noted improvement on the past Business Relations factor, which it claims is contradictory to the SSA's decision not to consider the criterion.  See ECF No. 32-1 at 33 (citing ECF No. 26-2 at 173, 230).

Unless plaintiff can carry the "onerous" burden of demonstrating that the agency's performance rating "lacked any rational basis," the court "must defer to the SSA's decision." Overstreet Elec. Co., Inc. v. United States, 59 Fed. Cl. 99, 117 (2003) (citing, inter alia, Info. Tech., 316 F.3d at 1319; E.W. Bliss, 77 F.3d at 449).  Plaintiff cannot meet this standard.  First, to the extent that any conflict exists between the TET report and the SSA's award decision, the SSA's decision is authoritative.  Coastal Int'l Sec., Inc. v. United States, 93 Fed. Cl. 502, 536 (2010) (stating that, as a matter of law, the SSA is required to exercise independent judgment and is not bound by the findings of lower-level evaluators).  In any event, here, the SSA specifically explained the inconsistency between the two reports:  "At the time of the evaluation, the TET utilized 'legacy' PPIRS reports which contained the area of importance 'Business Relations'.  Business Relations is no longer used in the current version of the system." ECF No. 26-2 at 229.

More importantly, however, the SSA clearly articulated a rational basis both for disregarding the Small Business Utilization criteria and for assigning MVM a "Substantial Confidence" rating.  See id. at 228-30.  The SSA discussed MVM's staffing, the number of languages covered by its linguists, the professional comportment of MVM employees, and MVM's professional reputation.  See id.  It also acknowledged that MVM's ratings ranged from "Marginal" to "Exceptional."  See id.  After reviewing the details of MVM's three past performance references, the SSA concluded that "MVM's Past Performance submissions demonstrated successful performance on contracts relevant in size, scope, and complexity within the past five (5) years," which, in its view, justified its "Substantial Confidence" rating.  Id. at 243.  Plaintiff has failed to show that the agency's decision with regard to MVM's past performance lacked any rational basis; accordingly, the court defers to the SSA's decision and will not sustain plaintiff's protest on this basis.

F.     The Agency's Price Evaluation Was Not Irrational, Arbitrary, or Capricious

Plaintiff alleges two errors with regard to the agency's price evaluation:  (1) plaintiff argues that the agency "did not fairly consider offerors' total price as ICE's evaluation did not comply with FAR § 8.405-2(d)," ECF No. 32-1 at 34; and (2) plaintiff

claims that "ICE failed to fairly consider Metro's price quote assumptions regarding TDY cost savings," id. at 38.

>        1.      Total Price Evaluation

The RFQ stated that the agency would evaluate price quotes in accordance with Federal Acquisition Regulation (FAR) 8.404(d), which directs the agency to conduct "a price evaluation as required by 8.405-2(d)." See ECF No. 26-1 at 264 (RFQ provision); 48 C.F.R. § 8.404(d) (2018).  The price evaluation outlined in FAR 8.405-2(d) requires, in relevant part, as follows:

> The ordering activity shall evaluate all responses received using the evaluation criteria provided to the schedule contractors.  The ordering activity is responsible for considering the level of effort and the mix of labor proposed to perform a specific task being ordered, and for determining that the total price is reasonable.

48 C.F.R. § 8.405-2(d) (2018).  The RFQ also explicitly stated that:

> 3.      Vendors must also complete Attachment D – Pricing Evaluation Spreadsheet and return it with their price quote submission.  Attachment D – Pricing Evaluation Spreadsheet will be used solely for evaluation of price for award purposes only.

> 4.      Proposed Tier III rates will be evaluated for reasonableness separately from the evaluation of price for award purposes.

ECF No. 26-1 at 264.  Attachment D, in turn, included the following language at the top of each of its five pages:  "Only languages in Tier I & Tier II will be used in calculating a vendor's total evaluated price for award purposes.  Tier III languages will be evaluated separately for price reasonabl[e]ness." [3]  See id. at 286-90.

According to plaintiff, the agency's decision to include only Tier I and Tier II languages as part of its total evaluated price violated the requirements of FAR 8.405-2(d).  "[T]he RFQ required offerors to price linguist and supervisor rates for all three Tiers I-III of the language categories offered by the offerors.  Thus, pursuant to FAR § 8.405-2(d), ICE was required to evaluate the 'Total Price' for reasonableness—not just a subset." ECF No. 32-1 at 36.  And, plaintiff contends, if the agency had included the pricing for

---

[3]      The record indicates that the agency intentionally excluded Tier III pricing in the total evaluated price because "[t]he estimated labor hours required for Tier III languages case assignments could not be estimated and therefore were not included in Attachment – D for this reason."  ECF No. 26-2 at 143.

all three tiers in its total evaluated price, it "would have necessarily realized that MVM's Tier, I, II and III supervisor rates were higher than [plaintiff's] and that MVM's Tier III linguist and supervisor rates were also significantly higher than Metro's rates." Id. at 36-37.

Plaintiff's argument that the agency's price evaluation was improper hinges on its contention that the text of FAR 8.405-2(d), stating that the agency is "responsible . . . for determining that the total price is reasonable," is fundamentally at odds with the agency's decision to consider only Tier I and II languages in its total evaluated price. The court sees no such conflict. As an initial matter, FAR 8.405-2(d) instructs the agency to "evaluate all responses received using the evaluation criteria provided to the schedule contractors." The RFQ clearly indicated that the agency intended to include only Tier I and II languages in its "total evaluated price for award purposes," and that Tier III languages would be evaluated separately for reasonableness. ECF No. 26-1 at 264, 286-90. FAR 8.405-2(d) required the agency to abide by these terms.[4]

FAR 8.405-2(d) then vests the agency with the authority to "determin[e] that the total price is reasonable." The agency, as promised, conducted a reasonableness analysis for all three tiers of languages. The PET report explained that it evaluated the Tier I and II languages based on the "pricing evaluation spreadsheet" submitted by each offeror, and that it separately made a "fair & reasonableness determination . . . for all Tier III languages not included on the pricing evaluation spreadsheet." ECF No. 26-2 at 175. The PET concluded that all prices submitted by both plaintiff and MVM were reasonable. Id. at 176. The SSA followed the same evaluation structure, analyzing Tiers I and II based on the offerors' spreadsheets, and separately considering the reasonableness of Tier III pricing. The SSA concurred that all proposed prices were reasonable. See id. at 232-33.

Neither the record nor the law cited by plaintiff support its assertion that the agency was required to combine all three tiers of languages in its total evaluated price for

---

[4]     To the extent that plaintiff challenges the terms of the RFQ, its protest is untimely. See Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1315 (Fed. Cir. 2007) (holding that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection afterwards in a § 1491(b) action in the Court of Federal Claims."); id. at 1314 ("'Vendors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive award [sic] and then, if unsuccessful, claim the solicitation was infirm.'") (quoting Argencord Mach. & Equip., Inc. v. United States, 68 Fed. Cl. 167, 175 n.14 (2005)).

award purposes.  And the court has found no error in the agency's price evaluation process.  As such, the court cannot sustain plaintiff's protest on this basis.

2.      Assumptions Regarding TDY Cost Savings

Plaintiff next claims that the agency should have considered its expected TDY cost savings as part of its "total price evaluation."  See ECF No. 32-1 at 38.  According to plaintiff, the cost savings were an "assumption" that it was required to include—and the agency was required to consider—under the terms of the RFQ.  Id.  The RFQ stated, in the section titled "Factor 4:  Pricing," that "Vendors shall indicate, in this section only if any price related assumptions have been made."  ECF No. 26-1 at 263.  And plaintiff did, in fact, explain its expected TDY cost savings as part of its announced price assumptions, as directed.  See ECF No. 26-2 at 28-84.

This argument, however, fails for the same reason plaintiff's argument with regard to Tier III pricing failed.  The terms of the RFQ clearly indicated that the agency intended to include only Tier I and II languages in its "total evaluated price for award purposes." ECF No. 26-1 at 264, 286-90.  Plaintiff has not identified any part of the record or any legal authority that would require the agency to include expected TDY cost savings as part of that calculation.[5]

G.      The Agency's Best Value Determination Was Not Irrational

Finally, plaintiff argues that the agency's best value determination was arbitrary, capricious, and irrational because it "was based off a flawed technical and price evaluation."  ECF No. 32-1 at 40.  As support for this argument, plaintiff simply refers back to the substance of its previous arguments.  Because the court has rejected the arguments on which plaintiff relies, this final challenge likewise fails.

H.      Permanent Injunctive Relief Not Warranted

Plaintiff has not succeeded on the merits of its protest.  "Because proving success on the merits is a necessary element for a permanent injunction," Dell Fed. Sys., L.P. v. United States, 906 F.3d 982, 999 (Fed. Cir. 2018) (footnote omitted), no injunctive relief is warranted in this case.  This protest must be dismissed.

---

[5]      Here again, if plaintiff means to challenge the terms of the solicitation, its challenge is untimely.  See id.

IV.    Conclusion

Accordingly:

(1)    Plaintiff's motion for judgment on the administrative record, ECF No. 32, is **DENIED**;

(2)    Defendant's motion to strike, ECF No. 35, is **GRANTED**; the clerk's office is directed to **STRIKE** the declaration of Ariel H. Collis, **ECF No. 32-2**, and plaintiff's table, **ECF No. 32-3**;

(3)    Defendant's cross-motion for judgment on the AR, ECF No. 35, is **GRANTED**;

(4)    Intervenor-defendant's cross-motion for judgment on the AR, ECF No. 36, is **GRANTED**;

(5)    The clerk's office is directed to **ENTER** final judgment **DISMISSING** plaintiff's complaint, with prejudice; and

(6)    On or before **October 15, 2019**, counsel for the parties shall **CONFER** and **FILE** a **notice** of filing, attaching a proposed redacted version of this opinion, with any material deemed proprietary blacked out, so that a copy of the opinion can then be made available in the public record of this matter.

IT IS SO ORDERED.

s/Patricia E. Campbell-Smith
PATRICIA E. CAMPBELL-SMITH
Judge